ace

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **ANTHONY WAYNE ELROD,** | ) | **CONSOLIDATED CASES** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 05-3114-JAR** |
| | ) | |
| **R.D. SWANSON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |
| **ANTHONY WAYNE ELROD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 05-3127-JAR** |
| | ) | |
| **MARK X. SEDILLO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on defendants' Motion to Dismiss (Doc. 67), which was converted to a Motion for Summary Judgment pursuant to the Court's Order (Doc. 88). The Court also considers several other motions and objections filed by plaintiff over the course of this litigation. (Docs. 8, 19, 36, 58.) Finally, the Court considers plaintiff's Motion for Leave to Amend Complaints (Doc. 91). Plaintiff, a *pro se* litigant, filed a Complaint on March 7, 2005 in Case No. 05-3114-JAR against R.D. Swanson, a correctional counselor at United States Penitentiary ("USP") Leavenworth, as well as a number of other officials and personnel at the Bureau of Prisons ("BOP") and at USP Leavenworth, alleging that his constitutional rights were

violated when he was exposed to environmental tobacco smoke ("ETS") during his incarceration at USP Leavenworth.  Then on March 17, 2005, plaintiff filed a Complaint in Case No. 05-3127-JAR claiming that personnel at USP Leavenworth violated his First, Fifth, Sixth, and Fourteenth Amendment right to access the courts.  On April 18, 2005, these two cases were consolidated for this Court's review.  For the reasons set forth below, the Court denies plaintiff's request to amend his Complaints, grants summary judgment in favor of defendants, and dismisses this consolidated action.

## I.      Plaintiff's Motion to Amend Complaints

Fed. R. Civ. P. 15(a) governs the amendment of pleadings.  Because of the advanced stage of the litigation in this case, the second sentence of Rule 15(a) applies, which contemplates that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."[1]  Thus, motions to amend are matters of discretion for the trial court.[2]  The Tenth Circuit has offered guidance by listing factors for courts to consider, such as futility of the amendment, a showing of undue delay, undue prejudice to the non-moving party, or bad faith of the moving party.[3]

Here, the Court denies plaintiff's motion because his attempt to amend the Complaint at this late stage in the proceeding amounts to undue delay.  "[A] district court acts within the bounds of its discretion when it denies leave to amend for 'untimeliness' or 'undue delay.'"[4]  In

---

[1]Fed. R. Civ. P. 15(a).

[2]*Woolsey v. Marion Lab., Inc.*, 934 F.2d 1452, 1462 (10th Cir. 1991).

[3]*Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993).

[4]*First City Bank, N.A. v. Air Capitol Aircraft Salfes, Inc.*, 820 F.2d 1127, 1133 (10th Cir. 1987).

this case, plaintiff filed both Complaints in 2005, and defendants currently have a pending dispositive motion on file with the Court. Plaintiff offers no reason for the delay in moving to amend other than his assertion that he needs to clarify his claims because he believes defendants misunderstand his allegations. Because plaintiff's request is untimely, the Court finds no reason to allow him to amend his Complaints.

Even if plaintiff's request was timely, the motion for leave to amend fails to comply with the local rules. D. Kan. R. 15.1 requires that "a motion to amend . . . that may not be filed as a matter of right shall set forth a concise statement of the amendment or leave sought to be allowed *with the proposed pleading attached*."[5] Here, plaintiff did not attach a proposed pleading so the Court cannot determine how plaintiff is attempting to amend his Complaints. However, based on plaintiff's descriptions of the proposed amendments as stated in his motion, the Court finds that such amendments would be futile. Plaintiff states that he "seeks leave to amend so that he can make his two claims clear to the defendants."[6] He further proclaims that he "has done so in his response (paragraphs 1 and 17) but he would like to do so in an amended complaint to clarify any misunderstanding as to what the claim is in each case."[7] Plaintiff emphasizes that he "does not wish to add any claims to the complaints."[8]

A prisoner is required to "plead his claims with 'a short plain statement . . . showing that

---

[5]D. Kan. R. 15.1 (emphasis added).

[6](Doc. 91 at 2.)

[7](*Id.*)

[8](*Id.* (emphasis in original)).

[he] is entitled to relief,' in compliance with Fed. R. Civ. P. 8(a)(2) . . . ."[9]  The Court finds that in this case plaintiff has adequately plead his claims for violations of constitutional rights in both Case No. 05-3114-JAR and Case No. 05-3127-JAR.  Further, plaintiff has provided the additional clarification of these claims in his response.[10]  Therefore, the Court finds there is no need for plaintiff to amend his Complaints in this case, as such an amendment would be futile.  Accordingly, his motion to amend is denied.

## II.    Plaintiff's Motions and Objections

On April 22, 2005, a "Motion for Order" was filed by plaintiff through his next-friend, Yorie von Kahl.[11]  Plaintiff filed this motion while he was housed at USP Leavenworth, and he requests the Court intervene and investigate plaintiff's medical condition.  Plaintiff contends that he was severely beaten by officers at USP Leavenworth and that he was not receiving appropriate medical attention.  Plaintiff requests the Court to order the United States Marshals (1) to enter USP Leavenworth, (2) to inspect plaintiff, plaintiff's medical records, relevant witnesses, and any files relating to his allegations, and (3) to protect plaintiff from present and future harm.

On June 13, 2005, plaintiff filed an "Emergency Motion for an Immediate Evidentiary Hearing, Judicial Intervention, Protective Order, Judicial Notice, Request for a Subpoena and Request for an Injunction" (hereinafter "Emergency Motion").[12]  In this motion, plaintiff alleges

---

[9]*Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1210 (10th Cir. 2003) (quoting *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000) (citing *Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir. 1998))); *abrogated on other grounds by Jones v. Bock*, 127 S. Ct. 910 (2007).

[10]The Court notes that plaintiff's response spans 74 pages.

[11](Doc. 8.)

[12](Doc. 19.)

that on April 14, 2005, he was severely beaten by "named Defendants and other BOP

Correctional Officers."  On June 17, 2005, United States Magistrate Judge O'Hara ordered

defendants to file a response to plaintiff's motion concurrent with the filing of their Answer or

other responsive pleading.[13]  Additionally, Judge O'Hara ordered defendants to "secure and

maintain any surveillance tapes which may be relevant to this case."[14]  Defendants have

informed the Court that a copy of the surveillance video has been secured.  On August 17, 2005,

the Court received notice that plaintiff had been transferred from USP Leavenworth to another

facility.

　　Because plaintiff's requests in his "Motion for Order" and "Emergency Motion" are for

injunctive relief and plaintiff is currently incarcerated at another facility, the Court finds that

plaintiff's claims in these motions are moot.  The Supreme Court has held that "those who seek

to invoke the power of the federal courts must allege an actual case or controversy."[15]  This

requirement requires courts to decline jurisdiction where "the award of any requested relief

would be moot—i.e. where the controversy is no longer live and ongoing."[16]  A claim should be

"deemed moot unless a proper judicial resolution settles some dispute which affects the behavior

of the defendant toward the plaintiff."[17]  "A case may become moot because events subsequent to

the filing of the case have resolved the dispute and, as a result, there is no longer an actual

---

[13](Doc. 20.)

[14](*Id.*)

[15]*O'Shea v. Littleton*, 414 U.S. 488, 493 (1974).

[16]*Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477–78 (1990); *Cox v. Phelps Dodge Corp.*, 43 F.3d
1345, 1348 (10th Cir. 1994), *superseded on other grounds by* 42 U.S.C. § 1981a.

[17]*Beierle v. Colo. Dept. of Corr.*, 79 Fed. App'x 373, 375 (10th Cir. 2003) (quoting *McAlpine v. Thompson*,
187 F.3d 1213, 1216 (10th Cir. 1999)).

controversy between adverse litigants."[18]

Here, the injunctive relief sought by plaintiff would provide no remedy to the conditions alleged in the Complaints because plaintiff is no longer incarcerated at USP Leavenworth, and there is no indication that he is to be returned to that location.  Therefore, because the Court cannot grant the requested relief to plaintiff, his motions must be denied.[19]

Plaintiff has also filed objections to two orders issued by Judge O'Hara.  Plaintiff first objected to the July 6, 2005 Order granting defendants an additional sixty days in which to answer or otherwise respond to plaintiff's Complaint.[20]  Plaintiff later objected to the August 3, 2005 Order denying plaintiff's motion to compel process and service on unserved defendants.[21]

Fed. R. Civ. P. 72(b) allows a party to provide specific, written objections to the magistrate judge's order.  The rule states that "[t]he district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions."[22]  With respect to a magistrate judge's order relating to nondispositive pretrial matters, the district court does not conduct a *de novo* review; rather, the court applies a more deferential standard by which the moving party must show that the magistrate judge's

---

[18]*Dist. 22 United Mine Workers of Am. v. Utah*, 229 F.3d 982, 987 (10th Cir. 2000).

[19]The Court notes that plaintiff has filed another civil action against various officials at USP Leavenworth asserting violations of his constitutional rights based on the alleged beating that plaintiff suffered at USP Leavenworth.  *Elrod v. Walker et al.*, No. 06-3115-SAC.  Although plaintiff's motions in this case are now moot, the Court notes that plaintiff has another avenue by which to seek relief for his allegations that he was beaten by prison officials in his other pending civil action.

[20](Doc. 36.)

[21](Doc. 58.)

[22]Fed. R. Civ. P. 72(b).

order is "clearly erroneous or contrary to law."[23]  "The clearly erroneous standard applies to

factual findings, and 'requires that the reviewing court affirm unless it "on the entire evidence is

left with the definite and firm conviction that a mistake has been committed."'"[24]

The July 6, 2005 Order granting defendants an additional sixty days in which to answer

or otherwise respond to plaintiff's Complaint addressed nondispositive pretrial matters in this

case.  After reviewing Judge O'Hara's order, as well as the parties' submissions, the Court finds

that Judge O'Hara's decision is not clearly erroneous or contrary to law.  Therefore, the Court

overrules and denies plaintiff's objection to this Order.

On the other hand, the August 3, 2005 Order denying plaintiff's motion to compel

process and service on unserved defendants was a dispositive order in that the Court refused to

effect service on Michael K. Nalley and effectively extinguished plaintiff's claims against this

defendant.  "When the magistrate judge's order denying a motion to amend, however, effectively

removes a defense or claim from the case, it may well be a dispositive ruling that the district

court should review *de novo*."[25]  After reviewing plaintiff's Complaint in Case No. 05-3127, the

Court finds that plaintiff properly named Michael K. Nalley as a defendant in that action.

Therefore, Michael K. Nalley should have been served with service of process in this

consolidated action, and it was an error for the magistrate judge to deny plaintiff's motion to

---

[23]*First Union Mortgage Corp. v. Smith*, 229 F.3d 992, 995 (10th Cir. 2000) (quoting *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1461–62 (10th Cir. 1988); 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a)).

[24]*McCormick v. City of Lawrence*, No. 02-2135-JWL, 2005 WL 1606595, at *2 (D. Kan. July 8, 2005) (citing 12 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 3069, at 355 (2d ed. 1997) and quoting *Ocelot Oil*, 847 F.2d at 1464 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948))).

[25]*Pedro v. Armour Swift-Eckrich*, 118 F. Supp. 2d 1155, 1157 (D. Kan. 2000) (citing *Allendale Mut. Ins. Co. v. Rutherford*, 178 F.R.D. 1, 2 (D. Me. 1998)).

compel process.  Thus, the Court sustains plaintiff's objection to Judge O'Hara's August 3, 2005

Order.

Defendants move to dismiss Michael K. Nalley for insufficiency of process and

insufficiency of service of process under Fed. R. Civ. P. 12(b)(4) and 12(b)(5).  *Bivens* actions

against federal employees require personal service pursuant to Fed. R. Civ. P. 4(e) or waiver of

process under Fed. R. Civ. P. 4(d).[26]  In this case, the clerk of the court was ordered on April 18,

2005 to issue appropriate summons and waivers on behalf of plaintiff pursuant to Fed. R. Civ. P.

4.  Waivers of service as to all defendants were issued on April 18, 2005.  To date, a waiver of

service has not been executed, and thus service has not been effected on Michael K. Nalley.

Thus, service has not been properly made on this defendant, and pursuant to Fed. R. Civ. Pro.

4(m), the Court concludes that Michael K. Nalley should be dismissed without prejudice because

of the failure to effect service within the 120 day time limit.  This defendant has not filed an

Answer; rather all of the defendants have filed a motion to dismiss or, in the alternative, a

motion for summary judgment.  The Court will thus dismiss without prejudice defendant

Michael K. Nalley.[27]

The Court also notes that plaintiff has filed a Notice to the Court regarding inmate mail.[28]

In this filing, plaintiff complains that he never received the Court's March 20, 2006 Order[29] at

Federal Correctional Institution Greenville, where plaintiff was incarcerated at that time.  He

---

[26]*Armstrong v. Sears*, 33 F.3d 182, 187 (2d Cir. 1994).

[27]However, the Court notes that even if plaintiff were to refile this action against Michael K. Nalley, his claims would fail for the same reasons outlined below in Part V.B.2.

[28](Doc. 89.)

[29](Doc. 88.)

also requests "that all Court orders be sent via 'SPECIAL Mail' and Certified Mail" because he accuses prison officials of "trashing" his mail "in an effort to obtain a default judgment in this case."[30]  The Court advises plaintiff that the administrative procedures in this district provide that *pro se* filers will receive orders of the court by first class mail, as *pro se* filers are not allowed to register with the court's electronic filing system.  Fed. R. Civ. P. 77(d) provides that the clerk shall serve notice of court orders immediately upon entry in the manner provided in Rule 5(b). Fed. R. Civ. P. 5(b)(2)(B) allows for service by mail, and states that: "Service by mail is complete on mailing."  Here, the court clerk mailed service of the document, of which plaintiff complains he never received.  The Court does not find that there has been a violation of the rules, and therefore denies plaintiff's request to send future orders and correspondence by certified mail.  Further, the Court notes that there is no evidence that plaintiff suffered any prejudice as a result of the delay, such as the inability to appeal the decisions of the Court.[31]  In fact, the Court notes that plaintiff complied with the March 20, 2006 Order that required defendant to respond to defendants' summary judgment motion by April 24, 2006.  The Court and the court clerk are aware that plaintiff is entitled to prompt notice of filings by first class mail, and will diligently ensure that notice is provided in the future.

## III.    Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or viewed in the light most

---

[30](Doc. 89 at 2–3.)

[31]*See, e.g.*, *Johnson v. Champion*, 288 F.3d 1215, 1227–28 (10th Cir. 2002) (explaining that failure of clerk to provide documents to plaintiff necessary to file a timely appeal amounted to prejudice).

favorable to plaintiff.[32]  Plaintiff is federal inmate, who is currently incarcerated at the United

States Penitentiary in Coleman, Florida ("USP Coleman").  From February 2, 2002 through

November 12, 2003, and again from March 11, 2004 through August 4, 2005, plaintiff was

incarcerated at USP Leavenworth.  During his confinement at USP Leavenworth, plaintiff was

housed in various quarters, including some units which were designated as smoke-free.

However, plaintiff was housed in smoking units during the following time periods: (1) February

27 through March 6, 2002; (2) September 24, 2002 through October 2, 2002; and (3) January 1,

2003 through July 31, 2003.  After July 2003, plaintiff was housed in smoke-free units while at

USP Leavenworth.  The entire institution of USP Leavenworth became smoke-free in November,

2004.

### Smoking Policies at USP Leavenworth

The Bureau of Prisons ("BOP") has had policies in place to address the issue of inmate

smoking, including designated smoking and non-smoking areas within an institution to limit

exposure to ETS.  Since 1986, the BOP has been addressing the issue of ETS by giving attention

to hazardous areas, elevators, rooms with little or no ventilation, auditoriums, class rooms, and

conference rooms.  In 1990, the BOP changed its policy to limit smoking areas to the minimum

number of areas possible, consistent with effective operations, and specifically prohibited

smoking in various areas.  In 1994, the BOP again changed its policy to indicate all areas of the

---

[32]Pursuant to D. Kan. R. 56.1(a), "[a]ll material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."  In his response to defendants' motion, plaintiff fails to controvert defendants' statements of fact in accordance with this rule.  The Court has examined defendants' submissions to determine if they have met their initial burden under Fed. R. Civ. P. 56 of demonstrating that no material issues of fact remain for trial and that the moving party is entitled to judgment as a matter of law.  Where defendants' statements of fact find support in the record, the Court adopts such facts as uncontroverted.  *See Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

institutions are non-smoking unless specifically identified by the Warden, and gave discretion to limit indoor smoking areas.  In July 2004, the agency again changed its policy to permit the Warden to entirely eliminate smoking areas within the institutions.  In November 2004, after giving the inmate population proper notice, the Warden at USP Leavenworth discontinued the sale of smoking items in the commissary and designated the prison a smoke-free institution.

From May 2001, through August 2002, and July 2003, through September 2004, Mark Sedillo was a Unit Manager for the C-Unit at USP Leavenworth.  As part of his duties as Unit Manager, Sedillo provided oversight to unit team staff, assisted inmates with programming issues, reviewed disciplinary matters, and provided assistance to issues of concern with the inmate population.  From April 2002, through July 2003, and from October 2, 2005, through the present, Robert Bennett has been a Unit Manager for the C-Unit at USP Leavenworth.  As part of his duties as Unit Manager, Bennett provides oversight to unit team staff, assists inmates with programming issues, reviews disciplinary matters, and provides assistance to issues of concern with the inmate population.  Plaintiff was assigned to Sedillo's unit during the following time periods: (1) March 2002 to August 2002, (2) July 2003 to November 2003, and (3) March 2004 to September 2004.  Plaintiff was also later assigned to Sedillo's unit in 2005.  Bennett was plaintiff's unit manager from April 2002 to July 2003, when plaintiff was housed intermittently in the C-Unit or Administrative Detention.

At USP Leavenworth, the C-1 Unit was designated as a non-smoking unit.  All inmates housed in that unit were not permitted to smoke in their cells or in the common areas.  In other units, inmates were permitted some smoking privileges, primarily in their cells or other designated smoking areas.  In January of 2002, to help enforce the non-smoking policy, Sedillo

advised the inmate population in writing of the policy regarding the prohibition on the use of

tobacco in the C-Unit.  However, from January 2003 through July 2003, all units, including C-1

Unit, had an unusual influx of inmates due to a renovation project at USP Leavenworth.

Because of this influx, smoking was temporarily permitted in the C-1 Unit during this time

period.  Smoking was permitted only within individual cells and only with the cell doors shut.

The inmate population was advised of this change and told of the potential discipline which

might result for smoking in unauthorized areas.

      In July 2003, the C-1 Unit was reinstated as a non-smoking unit.  The inmate population

was again advised by written memorandum of the no-smoking policy and that staff would be

strictly enforcing the policy.  Unit Manager Sedillo maintains that he and his staff addressed the

issue of inmate smoking in unauthorized areas, disciplining those inmates found in violation of

the rules.  Unit Manager Sedillo also claims that he worked with the inmate population to

identify individuals violating the policies.  In 2002, three inmates were disciplined for smoking

in an unauthorized area.  In 2003, sixteen inmates were disciplined for smoking in an

unauthorized area, and in 2004, thirty-eight inmates were disciplined for smoking in an

unauthorized area.

      Unit Manager Bennett maintains that he and the unit team worked to place non-smoking

inmates with a non-smoking roommate.  As Unit Manager, Bennett enforced the non-smoking

policy of the C-Unit.  When inmates were observed by Bennett smoking in areas designated as

non-smoking areas, he states that he would forward an incident report for smoking in an

unauthorized area to the Lieutenant's office for investigation.  Unit Manager Bennett attempted

to work with plaintiff to ensure he was not placed with a smoking roommate, to identify and

discipline inmates smoking in unauthorized areas, and to limit the impact of the unit temporarily

being designated with limited smoking areas.  On rare occasions, and only on a temporary basis,

smoking inmates would be placed on C-1 Unit.  However, the inmates would still need to

comply with the regulations of the unit, which would include no smoking in the unit.  If an

inmate was caught smoking in the unauthorized area, they would be referred for disciplinary

action.

The air ventilation system at USP Leavenworth is set up to circulate a certain percentage

of outside air into the individual cells.  American Correctional Association ("ACA") standards

set forth the specific guidelines for air ventilation in inmate housing units.  Specifically, ACA

standards 4-4151 and 4-4152, require indoor air quality to be at least 15 cubic feet of outside or

recirculated filtered air per minute per occupant of the rooms, officer stations, and dining areas,

as documented by an independent, qualified source for new constructions and circulation for

existing structures.  Since 1999, USP Leavenworth has been accredited by the ACA, and found

to be in compliance with ventilation standards.  In October 1999, inspection of the C-Unit

revealed at least 30–98 cubic feet of outside air being circulated in the inmate cells.  USP

Leavenworth underwent re-accreditation in August 2003, and again the institution was found in

compliance with ACA standards.

### *Plaintiff's Medical History*

Plaintiff has a history of asthma which preexisted his incarceration.  He has used

Albulerol and other inhaler medication since as early as 1998.  Upon plaintiff's intake at USP

Leavenworth, on February 7, 2002, plaintiff was evaluated, continued on his asthma medication,

including Albuterol and Beclomethasone inhalers, and referred to the Chronic Care Clinic

("CCC") for follow up on his pulmonary issue, specifically his asthma.  Plaintiff continued to

receive these medications and medical evaluations during his time at USP Leavenworth.  While

plaintiff contends he should have been placed in a non-smoking unit and/or placed with non-

smoking roommates, Dr. William B. McCollum, Clinical Director at USP Leavenworth, declares

that there were no clinical indications, such as significant changes with plaintiff's peak flow (rate

of how well a person breathes) or his 0-2 oxygenation or oxygen saturation levels (percentage

measure of level of oxygen in blood), which indicated such a recommendation was clinically

necessary.  Plaintiff's peak flow and oxygenation levels remained relatively stable, with

expected fluctuations, throughout his incarceration at USP Leavenworth.  Plaintiff's peak flow

level was noted only on three occasions to be in the 300 and/or 500 level range.  All other peak

flow measurements taken ranged between 400 and 485.[33]  Plaintiff's oxygenation levels

remained relatively stable and within the normal range, between 94% and 98%.  Such levels

remained stable prior to, during, and subsequent to plaintiff expressing complaints to medical

staff about ETS issues.

Plaintiff received medical treatment or evaluations during his incarceration at the

following times.  On February 17, 2002, plaintiff complained of a sore throat and cough.  He was

diagnosed with an upper respiratory infection and provided with an antibiotic.  On March 4,

2002, plaintiff was seen in the CCC for asthma.  Plaintiff noted he was doing well, with some

congestion.  His lungs were examined, and noted to be clear, his peak flow of 480 was within

---

[33]Plaintiff contends that these measurements are not within the normal range.  In support of this statement, he has attached an unauthenticated document, a chart titled "Normal Predicted Average Peak Expiratory Flow." Plaintiff has failed to comply with Fed. R. Civ. P. 56(e)'s requirement that documents must be authenticated, and thus the Court will not consider this document in its ruling.  *See Boilermaker-Blacksmith Nat'l Pension Fund v. Gendron*, 96 F. Supp. 2d 1202, 1205 n.2 (D. Kan. 2000) (citations omitted).

normal range, and his oxygen saturation level was within normal ranges at 96%. Plaintiff was provided with education about his asthma and prescribed appropriate medications, including Albuterol and Tramcinolone inhalers. On March 22, 2002, plaintiff was seen again for some adjustments in his asthma medication. At that time, plaintiff was placed on Beclomethasone oral inhaler. On April 4, 2002, plaintiff complained of shortness of breath on exertion and chronic swelling in both legs. Plaintiff sought permission not to have to work at an institution job due to his medical condition, and received a renewal of a soft shoe permit. Plaintiff was evaluated, and noted to be morbidly obese. His lungs were checked and noted to be clear. Plaintiff's oxygen saturation level was at 95%, and his peak flow of 465–485 was in the normal range. Plaintiff indicated he had a history of occupational chemical exposure years ago, but could not recall the name of the chemical. Plaintiff was prescribed appropriate medications and advised about his other conditions related to his obesity.

Plaintiff was seen again on May 14, 2002, and related that he had been exposed to carpet cleaning solutions in the past, up to 1993. Plaintiff was evaluated on his conditions unrelated to his asthma. On May 28, 2002, plaintiff was again seen in the CCC, where his chest was checked and found to be normal. His oxygenation saturation level was at 94%, which was within normal levels, and his peak flow of 480 was within normal range. Plaintiff was again continued on his medications including his inhalers. On July 23, 2002, plaintiff went to sick call, and complained of an itchy scalp and hemorrhoids. He also noted allergies and chronic itching eyes. Plaintiff was provided with appropriate medications for his conditions. On July 30, 2002, plaintiff was seen in the CCC for various conditions, including his obesity, back pain, and his asthma. Plaintiff's lungs were checked and were clear. His oxygen saturation levels of 97% were within

normal range, but his peak flow was at 300.  Plaintiff was continued on his current medications.

On September 20, 2002, plaintiff was seen for muscle spasm.  Due to his history of asthma, his lungs were checked, and noted wheezing.  His oxygen saturation level was within normal range at 96% and his peak flows of 440–480 were within normal range.  Plaintiff was prescribed appropriate medications, including an Albuterol and Triamcinolone inhaler.  On October 3, 2002, plaintiff was seen in the Special Housing Unit and had his various prescriptions, including his asthma medications continued.  On November 24, 2002, plaintiff was seen in the CCC for asthma and obesity.  His lungs were checked and were clear.  Plaintiff made no complaints of asthma symptoms increasing or ETS issues.  He did complain of back pain, but noted the medications prescribed were helping.

On February 10, 2003, plaintiff was seen in the CCC for asthma and obesity.  For the first time, plaintiff complained that his asthma symptoms were aggravated by a cell mate smoking in his cell.  However, plaintiff's lungs were evaluated and noted to be clear.  His peak flow was 480 and noted in the normal range.  On February 20, 2003, plaintiff complained of an eye or nasal allergy "due to cell smoking in the unit," and he received treatment for his complaints.  On February 21, 2003, plaintiff complained he was having an asthma attack.  Plaintiff was evaluated, and medical staff noted his lungs were clear, his oxygen saturations were 97–98%, within normal range.  Plaintiff was given an inhaler treatment.  In March 2003, plaintiff was seen for chronic cough related to bronchitis.  He was prescribed appropriate medications, including an antibiotic.  On April 4, 2003, plaintiff was seen in the CCC for asthma and gastroesophageal reflux disease.  Plaintiff's lungs were checked and were found to be clear.  His peak flow was checked and was 400–440, within the normal range.  Plaintiff made no mention of

16

second-hand smoke issues.  On May 13, 2003, plaintiff was seen in sick call noting he had difficulty at night breathing and would wake up coughing.  Plaintiff's lungs were checked and were clear.  His peak flow was 420–470, in the normal range.  He noted he had eye problems due to second-hand smoke, with mild conjunctivitis objectively noted.  Plaintiff was continued on his asthma medication, and given medication to treat his eye and nose.  On June 23, 2003, plaintiff was seen in the CCC for his asthma and obesity.  He did not complain of second-hand smoke during this visit.  Plaintiff's lungs were checked and were clear, and he was continued with his inhaler medications.

On July 1, 2003, plaintiff complained of second-hand smoke aggravating his asthma. Plaintiff's lungs were checked and noted to be clear.  His peak flow was 460–500, in the normal range.  Plaintiff was educated concerning his condition, and prescribed appropriate medications.  On August 25, 2003, plaintiff complained to Dr. McCollum that he had wheezing over the weekend, possibly from the effects of second-hand smoke.  Plaintiff's chest was checked, and his peak flow was found to be 460, within the normal range.  Plaintiff was permitted to have an early refill of his inhaler of Albuterol, which had previously been ordered, and also was prescribed Naproxin for his complaints of back discomfort.  On August 29, 2003, plaintiff was seen in the CCC, again complaining of second-hand smoke aggravating his sinus and asthma.  His lungs were clear, and peak flow was noted to be 450–460, in the normal range. Plaintiff was educated on his medications and provided with additional medications, including Albuterol and Triamcinolone for his asthma.  On September 9, 2003, plaintiff was seen in emergency status for kidney stones and back pain, and related no complaints about asthma.

In November 2003, plaintiff was transferred to the United States Medical Center for

Federal Prisoners in Springfield, Missouri for his kidney stones and chronic back pain.  During the examination at that institution, his lungs were checked and were clear.  After returning to USP Leavenworth in March 2004, plaintiff was seen in the CCC on March 12, 2004.  Plaintiff was noted to be doing well, but had some chronic back pain.  Plaintiff was continued on his asthma medications.  On April 9, 2004, plaintiff was seen in the CCC and did not complain of second-hand smoke issues.  His lungs were checked, and were clear.  Plaintiff complained of lower back pain, and sought a nonformulary pain medication.  On April 20, 2004, plaintiff was seen at sick call, complaining that smoking in the unit was irritating his asthma.  Plaintiff's lungs were checked and noted to be clear, and his peak flow level was 375–430, within the normal range.  Plaintiff was continued on his medications, including his inhalers.  On April 29, 2004, plaintiff was seen at sick call, and diagnosed with an upper respiratory infection and/or bronchitis and prescribed an antibiotic.  On June 29, 2004, plaintiff was seen in the CCC and complained of his nose being stopped up, eyes itching, nausea, and breathing trouble due to second-hand smoke.  But plaintiff's objective results were relatively unchanged.  His lungs were checked and noted to be clear, and his peak flow levels were 450–480, within the normal range, and his oxygen saturation level was 97%.  Plaintiff was again continued on appropriate medications.

In July 2004, plaintiff experienced fever and symptoms similar to kidney stones, and was later taken to an outside hospital for an unrelated condition.  On July 20, 2004, plaintiff was seen in sick call, having returned the previous day from the hospital.  Plaintiff's lungs were checked, and were noted to be clear.  His oxygen saturation level was 97%, within the normal range.  On July 27, 2004, plaintiff was seen in sick call, where again his lungs were noted to be clear, and

18

his oxygen saturation levels within the normal range at 95%.  On August 5, 2004, plaintiff was seen in sick call, where his lungs were examined and noted to be clear; his oxygen saturation levels were within normal range at 94%.  During this examination, plaintiff did not complain about exposure to second hand smoke.

On September 16, 2004, plaintiff was seen in the CCC, and complained that second-hand smoke was still bothering his asthma and the smoke in the unit was bad.  However, his chest was checked, and noted to be clear, and his peak flow level was still relatively unchanged and in normal levels of 450–475.  Plaintiff was again continued on his medications, including his inhalers.  On November 8, 2004, plaintiff was seen in sick call, complaining that smokers were moved into the housing unit, causing him to have daily asthma attacks.  However, plaintiff's oxygen saturation levels were still within normal range at 97%, and his peak flow levels were relatively unchanged and within normal levels at 420–440.  Plaintiff was again provided with appropriate medications, including inhalers.  On December 20, 2004, plaintiff was seen at sick call for increased cough and chills.  He was diagnosed with an upper respiratory infection and provided antibiotics.  On December 23, 2004, plaintiff was seen in sick call, where his lungs were checked and were found to be clear, and his oxygen saturation levels were at 98%.  On February 15, 2005, plaintiff was seen in the CCC, where his lungs were checked and were clear. The last notation in plaintiff's medical records relating to ETS issues is on March 1, 2005, when it was noted that plaintiff was complaining that his housing unit was full of smokers which was aggravating his asthma.  However, plaintiff's oxygen saturation levels were at 97%, and his peak flow level remained normal at 460–480.  Plaintiff's lungs were checked and again were clear. Plaintiff was again continued on his medications.

19

As evidenced by his unchanging oxygen saturation levels and peak flow levels, plaintiff's chronic asthma condition remained relatively stable throughout his entire incarceration at USP Leavenworth. Additionally, his complaints of nasal and eye itching were chronic for plaintiff, and may have been related to an allergic condition. Dr. McCollum contends there is no medical evidence indicating that plaintiff's asthma condition, or his nasal and eye conditions were caused by or aggravated by ETS, if any existed. Additionally, plaintiff's obesity and gastroesophageal reflux disease may have had an impact on his pulmonary condition.

### Access to Administrative Remedies, Legal Documents, and Telephone Calls

In June 2003, plaintiff received five "Informal Attempt to Resolve" forms, or BP-8 forms. Unit Manager Bennett recalls plaintiff frequently using the remedy process. Unit Manager Bennett also recalls working with plaintiff to place more than one issue at a time on a form, possibly due to a shortage of actual forms or as a convenience for plaintiff to bring his issues forward. Plaintiff was permitted to place multiple issues on the same form. As plaintiff's Unit Manager, Sedillo contends that he referred plaintiff to his counselor or provided plaintiff with informal resolution forms and institutional administrative remedy forms when he requested such forms. Usually the informal resolutions are handled by a counselor, who would make attempts to investigate the complaint and provide the inmate with a response. Unit Manager Bennett maintains that he refers inmates seeking administrative remedy forms to the inmate's counselor for such forms. If the inmate indicates that he has a problem obtaining the form, Unit Manager Bennett investigates the issue to ensure such forms are provided. Unit Manager Bennett does not recall denying plaintiff three BP-9 forms in June 2003. If a shortage of forms

existed on that day, Unit Manager Bennett and his staff would have searched for the forms, but Unit Manager Bennett requires an inmate to provide a completed BP-8 prior to issuing a BP-9 form, to ensure that the inmate has attempted informal resolution.  Unit Manager Bennett denies retaliating against plaintiff in any manner, including denying him access to the administrative remedy program, placing him with smokers, and/or tampering with his legal material and placing smokers in his unit.

Unit Manager Sedillo denies that he denied plaintiff administrative remedy forms or that he hindered plaintiff's ability to file through the administrative remedy program.  Unit Manager Sedillo also denies improperly denying plaintiff a legal telephone call.  Unit Manager Bennett does not recall denying plaintiff a legal telephone call on November 19, 2002, at 3:35 p.m.  However, it would not be unusual for an inmate who expressed a verbal request for a legal telephone call, who had not provided any justification of a need for the call, such as a pending court deadline, to be denied the legal telephone call.  Normally, requests for legal telephone calls are in writing, utilizing the Inmate Request to Staff Member form, to set up a reasonable time for the call to take place, keeping in mind staff resources, institutional needs, and the needs of the inmate with respect to his legal case.  The stated time of 3:35 p.m. for plaintiff's requested phone call would have been approaching the institution's 4:00 p.m. mandatory count time.

The BOP has several avenues for inmates to have access to attorneys, including by legal telephone calls.  The policy for legal telephone calls is codified in 28 C.F.R. § 540.103, and Program Statement 5264.07, Telephone Regulations for Inmates.  Under this policy, the BOP recognizes several methods for an inmate to maintain confidential contact with an attorney,

including inmate-attorney special mail correspondence, private inmate-attorney visits, and occasional inmate-attorney unmonitored legal telephone calls.  In accordance with the regulation, when an inmate demonstrates to staff that communication by correspondence, visiting, or normal telephone use is not adequate, the Warden will not apply frequency limitations on inmate-attorney telephone calls.  The inmate bears the responsibility under this regulation to alert staff as to the need for the inmate-attorney telephone call, such as a pending court deadline where correspondence and visitation would not be effective.

On September 19, 2002, the BOP implemented a policy agency-wide concerning inmates and their possession of Presentence Investigation Reports ("PSR") and other similar court documents.  This policy was released under Program Statement 1351.05, Release of Information. Under the policy, an inmate incarcerated with the BOP is not permitted to keep a copy of the PSR, Statement of Reasons, and other similar court documents in his physical possession. However, an inmate is permitted to review such documents which are contained in the inmate's Central File.  Unit staff will assist the inmate with arranging for a time for the inmate to review the documents and will also work with the inmate to mail out a copy of the document to the court if needed for particular filings.  This policy was implemented due to BOP-identified security concerns related to an inmate's physical possession of these documents.  Specifically, the agency was identifying situations where inmates pressured other inmates to show copies of the PSR to reveal gang affiliations, financial resources, and/or government cooperation.  Inmate assaults, and at least one inmate homicide, were found to have been connected with these pressure tactics by offenders.

Cynthia Ashman was a Case Manager Coordinator at USP Leavenworth during the times

relevant to this action.  While she does not specifically recall plaintiff complaining about legal material taken from his possession, Ashman contends that it would not have been unusual for a unit team staff member to have taken plaintiff's documents.  In such a case, Ashman would indicate that such items could not be in the inmate's possession, in accordance with policy.  This prohibition is universally applied to all inmates incarcerated within the BOP.  Access to the PSRs and other similar documents was available to plaintiff, as with all inmates, through unit team members, as the documents were maintained in the inmate's Central File.  Ashman specifically denies throwing away plaintiff's legal materials or confiscating these materials in a retaliatory manner.  She also denies being involved in opening plaintiff's legal mail outside his presence in December 2002.  Occasionally, officials at the BOP may inadvertently open a properly marked legal envelope along with general correspondence.  While this is rare, the procedure is to notify the inmate that such an inadvertent opening of the legal mail did occur.

The BOP has a four-part administrative remedy program designed to address a federal inmate's concerns regarding any aspect of his or her confinement.  Plaintiff has filed a total of 296 administrative remedies with the BOP during his incarceration, with 131 remedies pertaining to issues related to events taking place at USP Leavenworth.  During the time frames plaintiff alleges he was denied administrative remedy forms and informal resolution forms, between May and June 2003, plaintiff managed to file 17 administrative remedies.

## IV.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of

23

law."[34]  The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[35]  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[36]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case.[37]  Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial.[38]  "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."[39]  Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.[40]  The court must consider the record in the light most favorable to the nonmoving party.[41]

The Court is also mindful that plaintiff is a *pro se* litigant in this case.  A *pro se* litigant's

---

[34]Fed. R. Civ. P. 56(c).

[35]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[36]*Id.* at 251–52.

[37]*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[38]*Anderson*, 477 U.S. at 256.

[39]*Id.*

[40]*Id.*

[41]*Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir. 1984), *cert. denied*, 469 U.S. 1214 (1985).

pleadings are to be liberally construed and are held to a less stringent standard.[42]  This rule requires the Court to look beyond a failure to cite proper legal authority, confusion of legal theories, and poor syntax or sentence construction.[43]  The Court is not authorized to become the advocate for the *pro se* litigant.[44]  "Despite the liberal construction afforded pro se pleadings, the court will not construct arguments or theories for the plaintiff in the absence of any discussion of those issues."[45]  Moreover, plaintiffs are not excused from compliance with fundamental rules of procedure because they are proceeding *pro se*.[46]  *Pro se* litigants must follow rules of procedure, including local rules.[47]  Plaintiff's *pro se* status, in and of itself, does not prevent this Court from granting summary judgment.[48]

## V.      Discussion

Initially, the Court notes that defendants ask for dismissal of this case, citing *Ross v. County of Bernalillo*.[49]  In that case, the Tenth Circuit held that because the Prison Litigation Reform Act ("PLRA") contains a total exhaustion requirement, the presence of unexhausted claims in a prisoner's complaint requires a district court to dismiss an action in its entirely

---

[42]*Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[43]*Id*. at 1110.

[44]*Id*.

[45]*Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991).

[46]*Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994), *cert. denied*, 513 U.S. 1090 (1995).

[47]*Green v. Dorrell*, 969 F.2d 915, 917 (10th Cir. 1992), *cert. denied*, 507 U.S. 940 (1993); *Campbell v. Meredith Corp.*, 260 F. Supp. 2d 1087, 1097 n.10 (D. Kan. 2003).

[48]*Northington v. Jackson*, 973 F.2d 1518, 1521 (10th Cir. 1992).

[49]365 F.3d 1181 (10th Cir. 2004).

without prejudice.[50]  It is true that with respect to his ETS claims, plaintiff incorporates two administrative remedies in his consolidated Complaints, Grievance Nos. 321058 and 359122, that he failed to fully exhaust.  However, since the filing of defendants' motion, the Supreme Court has abrogated the holding of *Ross.*  In *Jones v. Bock,*[51] the Supreme Court held that when a prison inmate has exhausted some, but not all, of the claims asserted in a complaint, the court should not dismiss the action but rather the court should proceed with the exhausted claims.[52] Therefore, the Court will not dismiss plaintiff's consolidated Complaints for his failure to exhaust administrative remedies.  Accordingly, the Court will proceed to address plaintiff's exhausted claims, which defendants have shown include: (1) smoking inmates were permitted to reside in the C-1 Unit, which had previously been a non-smoking unit; (2) two smokers had been moved into the unit in September 2003; (3) one legal mail envelope was opened outside his presence in November 18, 2002; (4) plaintiff was denied a legal call on November 19, 2002; (5) plaintiff was not provided with informal resolution forms in May and June 2003; (6) plaintiff was not provided with formal administrative forms for the institution level in May and June 2003; (7) plaintiff was denied legal calls from April 9 through April 16, 2004; (8) plaintiff was denied a legal call on May 21, 2004; and (9) staff took certain legal documents from plaintiff's possession, including his PSR in September 2004.

### A.    Official Capacity Claims

---

[50]*Id.* at 1189.

[51]127 S. Ct. 910 (2007).

[52]*Id.* at 923–26; *see also Aquilar-Avellaveda v. Terrell,* __ F.3d __, 2007 WL 646150, at *2 (10th Cir. Mar. 5, 2007) (recognizing that the Tenth Circuit's requirement that a prisoner plead and demonstrate that he has exhausted his administrative remedies for all claims prior to bringing a complaint or otherwise face dismissal of the entire action is no longer good law under *Jones v. Bock*).

In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,[53] the Supreme Court held that plaintiffs may seek damages from federal officials in their individual capacities for violations of the Fourth Amendment.[54]  Courts since *Bivens* have characterized additional constitutional claims against federal officials as *Bivens* claims.[55]  A plaintiff may not establish liability under *Bivens* against a federal official in his *official* capacity.[56]  In *Farmer v. Perrill*,[57] the Tenth Circuit explained that "an official-capacity suit contradicts the very nature of a *Bivens* action" and that "[t]here is no such animal as a *Bivens* suit against a public official tortfeasor in his or her official capacity."[58]  Instead, an action against a federal official in his official capacity is construed as an action against the United States.[59]

And, a suit for damages against the United States is barred by sovereign immunity unless such immunity has been waived.[60]  The United States has not waived sovereign immunity in *Bivens* actions.[61]  Therefore, because plaintiff's only proper action against defendants is a *Bivens*

---

[53]403 U.S. 388 (1971).

[54]*Id.* at 395–97.

[55]*See, e.g.*, *Carlson v. Green*, 446 U.S. 14, 18 (1980) (recognizing a *Bivens* action for Eighth Amendment violations).

[56]*Simmat v. United States Bureau of Prisons*, 413 F.3d 1225, 1231 (10th Cir. 2005); *see also Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1214 (10th Cir. 2003), *cert denied*, 543 U.S. 925 (2004) ("a *Bivens* claim cannot be brought against . . . defendants in their official capacities"), *abrogated on other grounds by Jones v. Bock*, 127 S. Ct. 910 (2007).

[57]275 F.3d 958 (10th Cir. 2001).

[58]*Id.* at 963.

[59]*Id.*

[60]*Atkinson v. O'Neill*, 867 F.2d 589, 590 (10th Cir. 1989).

[61]*Laury v. Greenfield*, 87 F. Supp. 2d 1210, 1213 (D. Kan. 2000); *see also F.D.I.C. v. Meyer*, 510 U.S. 471, 483–86 (1994).

action, his claims against the individually named defendants in their official capacities are barred by the doctrine of sovereign immunity.

Plaintiff also names the BOP and the Bureau of Prisons Inmate Trust Fund ("ITF") as a defendants. The ITF is a trust fund managed by the BOP and funded by commissary sales in federal prisons.[62] The BOP and the ITF, as entities of the United States government, may only be sued in their official capacities. Since plaintiff's claims against these entities are barred by sovereign immunity, the BOP and the ITF are dismissed from this action.

### B.    Individual Capacity Claims

As explained above, federal officials may be individually liable under *Bivens* for constitutional violations performed under color of federal authority.[63] However, qualified immunity is a defense to a *Bivens* action.[64] In their motion for summary judgment, defendants contend that they are entitled to qualified immunity. Upon a defendant's assertion of a qualified immunity defense in a summary judgment motion, plaintiff has a two-part burden. First, plaintiff must come forward with facts or allegations that the defendant's conduct was a violation of a clearly established constitutional or statutory right at the time of its occurrence, and second, plaintiff must show that the violated right was "clearly established such that a reasonable person in the defendant's position would have known the conduct violated the right."[65] The issue of

---

[62]31 U.S.C. § 1321(a)(22).

[63]*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 391 (1971) (concluding that federal agents may be held individually liable for Fourth Amendment violations).

[64]*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[65]*Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997); *see Pueblo Neighborhood Health Ctrs. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988).

immunity is a legal one and the Court may not avoid it by framing it as a factual issue.[66]  The

Supreme Court counsels that before addressing the issue of qualified immunity, the Court must

first consider: "Taken in the light most favorable to the party asserting the injury, do the facts

alleged show the officer's conduct violated a constitutional right?"[67]

> ### 1.      ETS Claims

In this case, plaintiff alleges that he was exposed to ETS at USP Leavenworth from other

inmates' and BOP staff's cigarettes, thereby subjecting him to cruel and unusual punishment in

violation of the Eighth Amendment.  In *Helling v. McKinney*,[68] the Supreme Court concluded

that exposing a prison inmate to ETS can violate a prisoner's right to be free from cruel and

unusual punishment under the Eighth Amendment.[69]  A prisoner may establish a claim under the

Eighth Amendment for compensatory relief by alleging that prison officials "have with

deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious

damage to his future health."[70]  To determine whether prison officials have violated a prisoner's

Eighth Amendment rights, a prisoner must satisfy a two-part test consisting of an objective and

subjective prong.[71]  The objective prong requires the prisoner to show that he is "being exposed

to unreasonably high levels of ETS."[72]  Additionally, the court must assess "whether society

---

[66]*Id.* at 1347.

[67]*Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Gonzales v. Martinez*, 403 F.3d 1179, 1186 (10th Cir. 2005).

[68]509 U.S. 25 (1993).

[69]*Id.* at 35.

[70]*Id.*

[71]*Id.*

[72]*Id.*

considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwilling to such a risk."[73]  The subjective prong requires the prisoner to show that the defendants were deliberately indifferent to the hazards of exposing plaintiff to ETS "determined in light of the prison authorities' current attitudes and conduct."[74]

### a.      Unreasonably High Levels of ETS

Plaintiff complains that his requests for smoke-free housing at USP Leavenworth were ignored by defendants.  However, under constitutional law, plaintiff is "not entitled to a completely smoke-free correctional facility."[75]  Rather, under *Helling*, plaintiff must show that he was exposed to unreasonably high levels of ETS.[76]  When viewing all of the evidence in the light most favorable to plaintiff, he has failed to make this showing.

Plaintiff alleges that he was exposed to "very large amounts" of ETS and that his housing unit was "full of second hand smoke."  Plaintiff also claims that other inmates and staff complained about the levels of ETS at USP Leavenworth.  Plaintiff further complains that he was housed in a room with a smoker and that there was so much smoke in his cell house unit and his individual cell that he suffered nausea, headaches, chest pain, difficulty breathing and numerous other symptoms of exposure to ETS.  However, the uncontroverted medical evidence provided by Dr. McCollum shows that there were no clinical indications, such as significant changes with plaintiff's peak flow or his oxygenation levels, that indicate that plaintiff's asthma

---

[73]*Id.* at 36.

[74]*Id.*

[75]*Barry v. Wilson*, 91 F.3d 159, 1996 WL 366217, at *2 (10th Cir. July 2, 1996) (unpublished table opinion).

[76]*Helling*, 509 U.S. at 35.

condition was caused or aggravated by unreasonably high levels of ETS.  Plaintiff had a history of asthma prior to his incarceration, and he received treatment and medication for this condition at USP Leavenworth.  Throughout his incarceration at the prison, plaintiff's peak flow and oxygenation levels remained relatively stable, with expected fluctuations, and within normal range.  These levels remained stable prior to, during, and subsequent to plaintiff expressing complaints to medical staff about ETS issues.  Further, the evidence shows that during his numerous visits with the medical staff at USP Leavenworth, plaintiff complained about the levels of ETS only nine times between March 2003 and March 2005.[77]  Each time plaintiff complained to medical staff, plaintiff's lungs were checked and his oxygenation levels were tested.  Plaintiff's lungs were also found to be clear, and his oxygenation levels were normal.

As further evidence, plaintiff attaches unauthenticated documents that he contends are commissary records from USP Leavenworth showing that 117,317 packs of cigarettes and 12,990 packs of cigars were sold in the first four months of 2002.  Even if the Court were to accept these records as properly submitted evidence on a summary judgment motion, plaintiff cannot show that he was exposed to all of the smoke generated by those tobacco products sold while he was incarcerated at USP Leavenworth.  This evidence does not show that plaintiff was exposed to unreasonably high levels of ETS.

Also, plaintiff alleges that one of the air handling units at USP Leavenworth was broken, and therefore it was not circulating air in the cell house.[78]  But plaintiff provides no evidence that

---

[77]Plaintiff filed this action on March 1, 2005.  "*Bivens* actions generally borrow the general personal injury limitations statute in the state where the action arose."  *Van Tu v. Koster*, 364 F.3d 1196, 1198 (10th Cir. 2004).  In this case, the statute of limitations is two years.  *See* K.S.A. § 60-513(a)(4).  Thus, plaintiff may only assert claims for alleged exposure that occurred between March 1, 2003 and March 1, 2005.

[78]Defendants contend that plaintiff has not fully exhausted his complaints regarding the broken fan as required under the PLRA.

the ventilation system at USP Leavenworth was inadequate.  Defendants have put forth evidence

that shows USP Leavenworth meets ACA standards for air ventilation in inmate housing units,

and plaintiff offers no evidence to controvert this fact outside of his own speculation.[79]

Plaintiff has only provided broad, conclusory allegations regarding the level of ETS to

which he was exposed, which is not sufficient evidence to show that the risk was "so grave that

it violates contemporary standards of decency."[80]  Thus, plaintiff cannot satisfy the objective

prong of the two-part test—that he was exposed to unreasonable levels of ETS—as required

under *Helling*.

### b.    Deliberate Indifference

However, even if plaintiff's claims that he was exposed to "very large amounts" of ETS

were enough evidence to satisfy the objective prong of the test, plaintiff has not shown that

defendants were deliberately indifferent to the risk.  "Deliberate indifference has objective and

subjective components."[81]  To meet the objective component of the deliberate indifference test,

the harm suffered must be "'sufficiently serious' to implicate the Cruel and Unusual Punishment

Clause."[82]  "To prevail on the subjective component, the prisoner must show that the defendants

'knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable

---

[79]"'To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.'" *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)).

[80]*Helling*, 509 U.S. at 36.

[81]*Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (citing *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006)).

[82]*Id.* (citing *Kikumura*, 461 F.3d at 1291).

measures to abate it.'"[83]

Upon viewing the evidence in the light most favorable to plaintiff, he has not shown that the harm was sufficiently serious that it violated the Eighth Amendment as required by the objective component.  While plaintiff claims that he has demonstrated deliberate indifference by his allegations that he suffered from asthma attacks, that he asked for smoke-free housing, and that defendants ignored his requests, he provides no evidence of an objectively serious medical need for defendants to have placed him in smoke-free housing.  Further, Dr. McCollum specifically found that there were no clinical indications that such a recommendation was medically necessary.  Plaintiff's peak flow levels and his oxygen saturation levels remained at normal levels without significant changes throughout his incarceration at USP Leavenworth; therefore, there is no evidence clinically indicating that plaintiff's asthma conditions were caused or aggravated by ETS.

Further, plaintiff has failed to show that defendants knew of the risk of harm and that defendants disregarded that risk as required by the subjective component.  While plaintiff alleges that defendants were deliberately indifferent to the risk of exposing plaintiff to ETS, the record contradicts his assertion.  During the relevant time periods, various policies regarding smoking were in place at USP Leavenworth.  The Supreme Court has stated that "the adoption of [a] smoking policy . . . bear[s] heavily on the inquiry into deliberate indifference."[84]

At USP Leavenworth, the C-1 Unit was designated as a non-smoking unit, and all inmates housed in the unit were not permitted to smoke in their cells or in the common areas.  In

---

[83]*Id.* (quoting *Kikumura*, 461 F.3d at 1293); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

[84]*Helling v. McKinney*, 509 U.S. 25, 36 (1993).

other units, inmates were permitted some smoking privileges, primarily in their cells or other designated smoking areas.  When the C-1 Unit was required to accommodate excess prisoners due to a renovation project, defendants implemented a limited smoking policy.  Smoking was permitted only within individual cells and only with the cell doors shut.  The inmate population was advised of this change and told of the potential discipline which might result for smoking in unauthorized areas.  Unit Manager Sedillo and Unit Manager Bennett maintain that the policy was strictly enforced, and any person found in violation of this policy was subject to discipline.

In July 2003, the C-1 Unit was reinstated as a non-smoking unit, and the inmate population was advised of the policy change and that staff would be strictly enforcing the no-smoking policy.  Unit Manager Bennett contends that he worked to place non-smoking inmates with a non-smoking roommate, and he attempted to work with plaintiff to ensure he was not placed with a smoking roommate.  While plaintiff denies that the smoking policies were enforced or that prisoners who violated the policies were disciplined, Unit Manager Sedillo and Unit Manager Bennett maintain that they and their staff addressed the issue of inmate smoking in unauthorized areas, disciplining those inmates found in violation of the rules.  In 2002, three inmates were disciplined for smoking in an unauthorized area.  In 2003, sixteen inmates were disciplined for smoking in an unauthorized area, and in 2004, thirty-eight inmates were disciplined for smoking in an unauthorized area.  This evidence does not show that defendants were deliberately indifferent to the risk of harm of ETS, but rather it demonstrates that defendants implemented and enforced a smoking policy in an attempt to limit ETS exposure and that defendants were willing to accommodate non-smoking inmates who did not want to be exposed to ETS.  Therefore, the Court concludes that plaintiff cannot satisfy the subjective prong

of the two-part test as required by *Helling* because he has not shown that defendants were deliberately indifferent to the hazards of exposing plaintiff to ETS.

Plaintiff has failed to show that defendants' conduct violated the Eighth Amendment because the record lacks sufficient evidence to support plaintiff's claim that he was exposed to unreasonably high levels of ETS or that defendants were deliberately indifferent to the hazards of exposing plaintiff to ETS.  Therefore, the Court need not proceed further on the qualified immunity issue.[85]  Because there is no evidence that defendants violated plaintiff's constitutional rights, defendants are entitled to summary judgment based on qualified immunity on plaintiff's ETS claims.

### 2.    Access to the Courts Claims

Plaintiff alleges that he was denied access to the courts in the following ways: one legal mail envelope was opened outside of his presence; he was denied legal calls; he was not provided with administrative remedy forms in May and June 2003; and prison staff took certain legal documents from his possession in September 2004.[86]  The Due Process Clauses of the Fifth and Fourteenth Amendments guarantee a constitutional right of access to the courts.[87]  The Supreme Court has explained "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal

---

[85]*See Taylor v. Meacham*, 82 F.3d 1556, 1564 (10th Cir. 1996) (declining to address whether plaintiff had asserted a violation of a clearly established constitutional right after concluding that no constitutional right was violated).

[86]While plaintiff lists other alleged wrongs committed against him by prison officials, these are the only claims regarding access to the courts that plaintiff has fully exhausted through the administrative remedy program as required by the PLRA.

[87]*Green v. Johnson*, 977 F.2d 1383, 1389 (10th Cir. 1992) (citing *Ward v. Kort*, 762 F.2d 856, 858 (10th Cir. 1985)).

papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."[88]  To bring a claim for violation of this constitutional right, a prisoner must show that he has suffered, or will imminently suffer, actual harm.[89]  However, this injury requirement is not satisfied by just any type of frustrated legal claim.[90]  Rather, "an inmate must go one step further" by demonstrating that the "denial of legal resources hindered the prisoner's efforts to pursue a nonfrivolous claim."[91]

In this case, plaintiff has not shown that the alleged denials of access to the courts have hindered his effort to pursue a nonfrivolous legal claim.  First, plaintiff has not shown that he suffered harm by defendants' alleged failure to provide him with administrative remedy forms.  While Unit Manager Sedillo and Bennett deny that they refused to provide plaintiff with administrative remedy forms, plaintiff contends that they hindered plaintiff's ability to file grievances by denying him access to the forms and by not processing the forms once he had turned them in to the prison.  However, viewing the evidence in the light most favorable to plaintiff, he has not shown that he was prevented from filing administrative remedies during May and June 2003.  The evidence shows that plaintiff has filed a total of 296 administrative remedies with the BOP during his incarceration, with 131 remedies pertaining to events taking place at USP Leavenworth.  In June 2003, plaintiff admits that he received five "Informal Attempt to Resolve" forms, and during the time frames plaintiff alleges he was denied administrative

---

[88]*Bounds v. Smith*, 430 U.S. 817, 828 (1977).

[89]*See Lewis v. Casey*, 518 U.S. 343, 349 (1996) (explaining that the requirement that an inmate show actual injury derives from the doctrine of standing).

[90]*Id.* at 354.

[91]*Penrod v. Zavaras*, 94 F.3d 1399, 1403 (10th Cir. 1996) (citing *Lewis*, 518 U.S. at 349, 356).

remedy forms and informal resolution forms, between May and June 2003, plaintiff actually filed 17 administrative remedies.  Therefore, because plaintiff was able to file administrative remedies during the times that he alleges defendants denied him forms, plaintiff has not shown that he suffered harm when he was able to access the grievance procedure during this time period.

Plaintiff also cannot show that he suffered injury by the alleged opening of a legal mail envelope on November 18, 2002.[92]  Plaintiff does not argue that the opening of this envelope interfered with his communication with counsel.  Further, plaintiff provides no evidence that this one incident of opening mail was anything more than an inadvertent mistake by prison officials.  "Such an isolated incident, without any evidence of improper motive or resulting interference with [plaintiff's] right to counsel or to access to the courts, does not give rise to a constitutional violation."[93]

Plaintiff also claims that defendants took all of his legal documents, including his § 2241 motion, and that defendants prevented him from contacting his legal counsel by denying him telephone calls.  Plaintiff claims that he has been prejudiced by defendants' actions because he was not able to file his § 2241 motion after it was allegedly confiscated and he was unable to speak to his attorneys who were helping him draft this motion.  Plaintiff also claims that he was prevented from filing his divorce proceedings in Leavenworth County, and he was not able to file an Eighth Amendment action regarding the conditions of the Special Housing Unit at USP Leavenworth which is now barred due to the expiration of the statute of limitations.  Also, plaintiff claims that he is entitled to injunctive relief; namely that these legal documents be

---

[92]The Court also notes that this claim is barred by the statute of limitations.  Plaintiff filed his complaint on March 17, 2005, two years after plaintiff alleges the legal mail envelope was opened on November 18, 2002.

[93]*Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir. 1990).

returned to him.

Plaintiff's Case Manager, Cynthia Ashman, does not specifically recall plaintiff complaining about legal material taken from his possession, but she states that it would not have been unusual for a unit team staff member to have taken plaintiff's documents.  The BOP has a policy prohibiting an inmate from keeping copies of the PSR, Statement of Reasons, and other similar court documents in their physical possession due to security concerns.  This prohibition is universally applied to all inmates incarcerated within the BOP.  When an inmate was in possession of such documents, Ashman would inform the inmate that such items could not be in the inmate's possession, in accordance with policy.  However, an inmate is able to access the PSR and other similar documents, which are maintained in the inmate's Central File.  Unit staff will assist the inmate with arranging for a time for the inmate to review the documents.

Plaintiff claims that he was entitled to keep these legal documents in his possession pursuant to 28 C.F.R. § 543.11(d).[94]  This regulation lists the types of documents that are included in an inmate's "legal materials."  However, the regulation does not specifically state that plaintiff is entitled to keep these documents in his possession.  Rather, the regulation gives the Warden authority to limit the amount of legal materials that an inmate can keep in his possession for security or housekeeping reasons.[95]  Plaintiff further contends that he was allowed to keep this legal material that is prohibited by the BOP policy because he did not have any

---

[94]28 C.F.R. § 543.11(d) states: "An inmate's legal materials include but are not limited to the inmate's pleadings and documents (such as a presentence report) that have been filed in court or with another judicial or administrative body, drafts of pleadings to be submitted by the inmate to a court or with other judicial or administrative body which contain the inmate's name and/or case caption prominently displayed on the first page, documents pertaining to an inmate's administrative case, photocopies of legal reference materials, and legal reference materials which are not available in the institution main law library (or basic law library in a satellite camp)."

[95]28 C.F.R. § 543.11(d)(2).

information in his PSR or other similar documents showing a gang affiliation or that he cooperated with the government.  But this BOP policy is applied universally to all inmates. While plaintiff maintains that having such documents in his possession would not pose a security risk, this argument is irrelevant when the BOP applies this policy to every inmate in its prisons. Based on these policies and regulations, the staff at USP Leavenworth had discretion to take these legal documents from his cell.

Additionally, plaintiff was not prejudiced by having these legal documents taken from his possession because he was able to access these documents upon request.  Plaintiff claims that he made requests to see these documents by filing "cop outs," but that his requests were ignored. When plaintiff filed a request for an administrative remedy regarding this issue,[96] his request for these documents was denied based on the BOP's policy prohibiting inmates from keeping these materials in their possession.[97]   However, plaintiff was specifically informed by Michael K. Nalley that if he required the documents for legal actions, plaintiff may submit an Inmate Request for Certification or Judicial Notice of Presentence Report/and or Statement of Reasons form (BP-S757.013).[98]  Plaintiff was further informed that these forms were available in the law library.[99]  Plaintiff does not contend that he filled out one of these forms, and his request to view his documents was denied, thereby preventing him from filing a legal action.  The BOP has a legitimate penological objective of maintaining security in the prisons that is furthered in its implementation of this policy that prohibits an inmate from possessing these documents.

---

[96]*See* Administrative Remedy No. 350990.  (Doc. 68, Ex. 1, Attach. R.)

[97](*Id.*)

[98](*Id.*)

[99](*Id.*)

Further, plaintiff is not completely denied access to such legal documents as he can submit a request to access them.  Because plaintiff does not assert that he requested these documents through the appropriate avenue and that his requests were denied, he has not shown that he suffered injury as required to support a constitutional claim for denial to access to the courts. Further, plaintiff is not entitled to injunctive relief in the form of these legal documents being returned to his possession because plaintiff is not allowed to possess certain documents under BOP policy and, in order to view these documents, he must request them through the appropriate process.

Plaintiff has also not shown that he was suffered harm in defendants' denial of phone calls.  Plaintiff first complains that he was denied a legal call on November 19, 2002.[100] However, the prison officials' responses to plaintiff's request for an administrative remedy show that plaintiff was denied this call because he was unable to provide evidence to support a need to contact the clerk of the court, rather than contacting his attorney.[101]  Further, plaintiff was provided a legal call on November 25, 2002.[102]  Thus, plaintiff cannot show that he suffered injury in defendants' alleged denial of a telephone call on November 18, 2002.

With respect to the alleged denials of phone calls from April 8 through April 16, 2004, plaintiff's request for an administrative remedy shows that he was allowed a fifteen-minute call with his attorney on April 8, 2004.[103]  Plaintiff complains that a prison official cut his conversation short, and then refused to let him call back his attorney.  Under BOP regulations, an

---

[100]The Court notes that this claim also fails because it falls outside of the statute of limitations.

[101]Administrative Remedy No. 350990.  (Doc. 68, Ex. 1, Attach. M.)

[102](*Id.*)

[103]Administrative Remedy No. 350990.  (Doc. 68, Ex. 1, Attach. P.)

inmate may be provided a legal call when he demonstrates to staff that communication by correspondence, visiting, or normal telephone use is not adequate.  The inmate bears the responsibility under this regulation to alert staff as to the need for the inmate-attorney telephone call, such as a pending court deadline where correspondence and visitation would not be effective.  Plaintiff does not assert or provide evidence that he showed prison officials of a need to contact his attorney and that despite such a need, his request was denied.  Further, plaintiff was allowed a fifteen-minute telephone call with his attorney on April 8, 2004.  Therefore, plaintiff has not shown that he was injured by these alleged denials to place phone calls.

Finally, plaintiff contends that he was denied a call on May 21, 2004.  Plaintiff filed a grievance with respect to this incident, and the grievance was denied because plaintiff failed to show a need to talk to his attorney by telephone, such as an imminent court deadline.[104]  Further, plaintiff was reminded that the BOP policy allows for telephone calls when the inmate demonstrates that correspondence by other methods, such as by mail or in-person visits, is inadequate.  Plaintiff has not shown that the alleged denial of this one phone call caused him to suffer an injury when there is no evidence that plaintiff demonstrated a need to call his attorney under the BOP policy and when there is no evidence showing that plaintiff could not have contacted his attorney by other methods.

Plaintiff also alleges that defendants retaliated against him for using the administrative remedy process by threatening plaintiff.  However, plaintiff has not exhausted any claims alleging retaliation.  The PLRA requires a prisoner to exhaust all available administrative

---

[104]Administrative Remedy No. 350990.  (Doc. 68, Ex. 1, Attach. Q.)

remedies before bringing an action with respect to prison conditions.[105]  "The grievance system is an important part of the administrative process that cannot be overlooked by prisoners."[106]  In this case, plaintiff has not exhausted his administrative remedies by filing grievances specifically alleging retaliation.  Therefore, the Court will dismiss plaintiff's claims of retaliation as unexhausted.[107]

Because plaintiff has not shown any actual or imminent harm caused by defendants' alleged denials of access to the courts, he cannot establish that defendants violated a constitutional right.  Therefore, the Court need not proceed further on the qualified immunity issue.[108]  Because there is no evidence that defendants violated plaintiff's constitutional rights, defendants are entitled to summary judgment based on qualified immunity on plaintiff's access to the courts claims.

## VI.    Conclusion

For the reasons set forth above, the Court concludes that there are no genuine issues of material fact remaining as to plaintiff's claims for unreasonable exposure to ETS or for denial of access to the courts.  Accordingly, summary judgment on these claims is granted in favor of all defendants, except for Michael K. Nalley.  As described above, Nalley should have been served with process.  Because service was not properly made on this defendant within the 120 day time

---

[105] 42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 524 (2002) (recognizing that the exhaustion requirement is mandatory for prisoners bringing *Bivens* actions).

[106] *Carr v. Brill*, 187 Fed. App'x 902, 905 (10th Cir. 2006).

[107] *See id.* (affirming the district court's dismissal of prisoner's complaint alleging retaliation for failure to exhaust his administrative remedies with respect to this claim).

[108] *See Taylor v. Meacham*, 82 F.3d 1556, 1564 (10th Cir. 1996) (declining to address whether plaintiff had asserted a violation of a clearly established constitutional right after concluding that no constitutional right was violated).

limit required by Fed. R. Civ. P. 4(m), the Court dismisses Nalley from this action without prejudice.  While plaintiff may pursue his claims against Nalley in the future, the Court cautions that Nalley, like the remaining defendants in this action, would also be entitled to summary judgment on plaintiff's claims that he was denied access to the courts for the reasons set forth above in this Memorandum and Order.

**IT IS THEREFORE BY THIS COURT ORDERED** that defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Doc. 67) is granted with respect to all defendants, except for Michael K. Nalley.

**IT IS FURTHER ORDERED** that defendant **Michael K. Nalley** is **DISMISSED WITHOUT PREJUDICE.**

**IT IS FURTHER ORDERED** that plaintiff's objection to the magistrate judge's order (Doc. 58) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's remaining pending motions and objections (Docs. 8, 19, 36) are **DENIED and OVERRULED**.

**IT IS FURTHER ORDERED** that plaintiff's Motion for Leave to Amend (Doc. 91) is **DENIED**.

Dated this 19th  day of March 2007.


 S/ Julie A. Robinson
Julie A. Robinson
United States District Judge